Paula D. Pearlman (SBN: 109038)
Paula.Pearlman@lls.edu
Shawna L. Parks (SBN: 208301)
Shawna.Parks@lls.edu
Maronel Barajas (SBN: 242044)
Maronel.Barajas@lls.edu
Rebecca A. Craemer (SBN: 274276)
Rebecca.Craemer@lls.edu
DISABILITY RIGHTS LEGAL CENTER
919 Albany St., Los Angeles, CA 90015
Telephone: 213-736-1031
Facsimile: 213-736-1428

John S. Gibson (SBN: 140647)
jsgibson@winston.com
Drew A. Robertson (SBN: 266317)
darobertson@winston.com
WINSTON & STRAWN LLP
333 S. Grand Ave., Los Angeles, CA 90071
Telephone: 213-615-1700
Facsimile: 213-615-1750

Attorneys for Plaintiff
C.C., by and through
MILKA CIRIACKS, his Guardian *Ad Litem*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.C., a minor, by and through MILKA CIRIACKS, his Guardian *Ad Litem*,<br><br>Plaintiff,<br><br>v.<br><br>CYPRESS SCHOOL DISTRICT, *et al.*,<br><br>Defendants. | Case No.: SACV 11-00352 AG (RNBx)<br><br>**[CORRECTED] NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: June 6, 2011<br>Time: 10:00 a.m.<br>Court: 10D<br><br>Action Filed: March 8, 2011<br>Judge: Hon. Andrew J. Guilford |

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**NOTICE OF MOTION**

TO DEFENDANTS CYPRESS SCHOOL DISTRICT, *et al.,* AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 6, 2011 or as soon as thereafter as counsel may be heard in Courtroom 10D, United States District Court, Central District of California, Southern Division, located at 411 West Fourth Street, Room 1053, Santa Ana, California 92701, Plaintiff C.C. will move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure and Rule 65-1 of the Civil Local Rules for a mandatory preliminary injunction requiring the District to accommodate C.C.'s use of his trained service dog  in school.

The motion will be made on the grounds that (i) the District's refusal to accommodate C.C.'s service dog violates federal and state disability laws, specifically Title II of the Americans with Disabilities Act (42 U.S.C. § 12131 *et seq.*), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq.*), California Government Code §§ 11135 *et seq.*, the Unruh Civil Rights Act (Cal. Civ. Code § 51 *et seq.*), and the California Disabled Persons Act (Cal. Civ. Code § 54.1 *et seq.*); (ii) C.C. is suffering, and will continue to suffer, irreparable injury as a result; (iii) the balance of hardships weighs in C.C.'s favor; and (iv) the public interest is best served by requiring the District to stop discriminating on the basis of disability.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

1    This motion is based upon this Notice; the accompanying Memorandum of

2    Points and Authorities; the declarations of Milka Ciriacks, Dr. Thomas Lin, Kati Rule-

3    Witko, Dr. Stephen Shore, and Dr. Cindy Adams; and the Request for Judicial Notice;

4    all pleadings and papers on file in this action; and any argument or evidence that may

5    be presented at the hearing on this matter, if a hearing is deemed necessary.

6

7    DATED:  May 5, 2011                    Respectfully submitted,

8                                           DISABILITY RIGHTS LEGAL CENTER
                                            WINSTON & STRAWN LLP
9

10                                          By:   /s/ John S. Gibson_____
11                                                John S. Gibson
                                                  Attorneys for the Plaintiff
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ............................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.   INTRODUCTION ................................................................. 1

II.  FACTUAL BACKGROUND........................................................... 1

    A.   C.C. Has Severe Autism .................................................. 1

    B.   Eddy is a Certified Service Dog Trained to do Work and Perform
        Tasks for the Benefit of C.C................................................ 3

        1.   Eddy Received Individualized Training to Meet C.C.'s
            Needs............................................................. 3

        2.   Eddy Works and Performs Tasks for the Benefit of C.C. .......... 4

    C.   It is Necessary for C.C. to Use His Service Dog While at School to
        Maintain Their Bond ...................................................... 5

    D.   The District Refuses to Accommodate C.C.'s Request to use his
        Service Dog While at School ............................................... 6

III. PROCEDURAL HISTORY .......................................................... 7

IV.  ARGUMENT..................................................................... 7

    A.   C.C. is Likely to Succeed on the Merits of his Claims Under
        Federal Law .............................................................. 9

        1.   The District is Discriminating Against C.C. by Failing to
            Accommodate C.C.'s Use of his Service Dog.......................... 11

        2.   Permitting C.C. to Use his Service Dog in School Would
            Not Fundamentally Alter the District's Programs ................... 13

    B.   C.C. Is Likely to Succeed on His Claims Under California Law ....... 15

        1.   The District is Violating the Disabled Persons Act by Failing
            to Accommodate C.C.'s Use of his Service Dog...................... 15

        2.   The District is Violating the Unruh Act by Failing to
            Accommodate C.C.'s Use of his Service Dog.......................... 16

        3.   The District is Violating California Government Code
            Section 11135 by not Permitting C.C. to Use his Service
            Dog................................................................ 17

i

C.  C.C. is Likely to Suffer Irreparable Harm Absent Preliminary
Relief .................................................................................................18

    1.  A Violation of C.C.'s Civil Rights Under the ADA
Constitutes Irreparable Harm.............................................18

    2.  C.C. is Suffering Irreparable Harm............................................19

    3.  Money Damages Are Inadequate to Compensate C.C. for
His Injuries .............................................................................21

D.  The Balance of Hardships Heavily Favors C.C. .................................22

E.  The Public Interest is Best Served by Issuing an Injunction
Permitting C.C. the Use of His Service Dog While at School............22

V.  PLAINTIFF SHOULD NOT BE REQUIRED TO POST A BOND............23

VI.  CONCLUSION....................................................................................24

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# <u>TABLE OF AUTHORITIES</u>

Page(s)

CASES

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ....................................................9

*Anderson v. Little League Baseball, Inc.,*
    794 F. Supp. 342 (D. Ariz. 1992) ...........................................23

*Anderson v. United States,*
    612 F.2d 1112 (9th Cir. 1979) ...................................................9

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ...................................................10

*Barahona-Gomez v. Reno,*
    167 F.3d 1228 (9th Cir. 1999) .................................................24

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch,*
    179 F.3d 725 (9th Cir. 1999) ...................................................12

*Brantley v. Maxwell-Jolley,*
    656 F. Supp. 2d 1161 (N.D. Cal. 2009).....................................24

*Cupolo v. Bay Area Rapid Transit,*
    5 F. Supp. 2d 1078 (N.D. Cal. 1997)......................................9, 22

*D.K. ex rel. G.M. v. Solano County Office of Educ.,*
    667 F.Supp.2d 1184 (E.D. Cal. 2009) ......................................18

*D.R. v. Antelope Valley Union High School Dist.,*
    746 F. Supp. 2d 1132 (C.D. Cal. 2010) ......................................9

*Dare v. California,*
    191 F.3d 1167 (9th Cir. 1999) .................................................12

*Dunlap v. Ass'n of Bay Area Gov'ts,*
    996 F.Supp. 962 (N.D. Cal. 1998)............................................11

*Franco-Gonzales v. Holder,*
    --- F. Supp. 2d ----, 2010 WL 5874537 (C.D. Cal. Dec. 27, 2010)......................9

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

*Henrietta D. v. Giulianni*,
 331 F.3d 261 (2d Cir. 2003) ................................................................10

*Hubbard v. SoBreck*,
 554 F.3d 742 (9th Cir. 2009) ........................................................16, 18

*Johnson v. Gambrinus Co./Spoetzl Brewery*,
 116 F.3d 1052 (5th Cir. 1997) ............................................................12

*Lopez v. Heckler*,
 713 F.2d 1432 (9th Cir. 1983), *rev'd in part on other grounds, Heckler v. Lopez*, 463 U.S. 1328 ..........................................................................23

*Lovell v. Chandler*,
 303 F.3d 1039 (9th Cir. 2002) ......................................................10, 12

*Mark H. v. Hamamoto*,
 620 F.3d 1090 (9th Cir. 2010) ............................................................15

*McGary v. City of Portland*,
 386 F.3d 1259 (9th Cir. 2004) ............................................................11

*People of State of Cal. v. Tahoe Reg'l Planning Agency*,
 766 F.2d 1319, *amended* 775 F.2d 998 (9th Cir. 1985) ....................24

*Presta v. Peninsula Corridor Joint Powers Bd.*,
 16 F.Supp. 2d 1134 (N.D. Cal. 1998) ................................................11

*Rep. of the Philippines v. Marcos*,
 862 F.2d 1355 (9th Cir. 1988) ..............................................................9

*Rodde v. Bonta*,
 357 F.3d 988 (9th Cir. 2004) ..............................................................10

*Save Our Sonoran, Inc. v. Flowers*,
 408 F.3d 1113 (9th Cir. 2004) ............................................................24

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
 251 F.3d 814 (9th Cir. 2001) ..............................................................19

*Sisson v. Helms*,
 751 F.2d 991 (9th Cir.), *cert. denied*, 474 U.S. 846 (1985) ..............14

iv

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

*Smallwood v. Nat'l Can Co.*,
   583 F.2d 419 (9th Cir. 1978) ........................................................................20

*Storms v. Fred Meyer Stores*,
   120 P.3d 126 (Wash. App. 2005) ...............................................................13

*Sullivan v. Vallejo City Unified Sch. Dist.*,
   731 F. Supp. 947 (E.D. Cal. 1990) .......................................................passim

*United States v. Nutricology, Inc.*,
   982 F.2d 394 (9th Cir. 1992) ......................................................................19

*Vinson v. Thomas*,
   288 F.3d 1145 (9th Cir. 2002) ...................................................................11

*Weinreich v. Los Angeles Cty. Metro. Transp. Auth.*,
   114 F.3d 976 (9th Cir. 1997) ......................................................................10

*Williams v. Grannis*,
   2010 WL 1405488 (E.D. Cal. 2010).........................................................18

*Wong v. Regents of Univ. of Cal.*,
   192 F.3d 807 (9th Cir. 1999) ......................................................................11

*Zepeda v. U.S. I.N.S.*,
   753 F.2d 719 (9th Cir. 1984) ......................................................................22

*Zukle v. Regents of Univ. of Cal.*,
   166 F.3d 1041 (9th Cir. 1999) ...................................................................10

**STATUTES**

29 U.S.C. § 794..............................................................................................1

29 U.S.C. § 794(a)........................................................................................10

42 U.S.C. § 12102........................................................................................11

42 U.S.C. § 12131 *et seq.*............................................................................1

42 U.S.C. § 12131(1)(A)..............................................................................11

42 U.S.C. § 12132........................................................................................10

v

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

42 U.S.C. §12134 ................................................................................12

42 U.S.C. § 12188 (a) (2) ..................................................................20

Cal. Civ. Code § 51 *et seq*.....................................................1, 17, 18

Cal. Civ. Code § 51(b) ........................................................................18

Cal. Civ. Code § 51(f) .........................................................................18

Cal. Civ. Code § 54.1 ...................................................................16, 17

Cal. Civ. Code § 54.1(d) .....................................................................16

Cal. Civ. Code § 54.1 *et seq*............................................................1, 16

Cal. Civ. Code § 54.2 ..........................................................................17

Cal Gov't Code § 11135 .......................................................1, 16, 18, 19

Cal Gov't Code § 11135(a) ..................................................................18

Section 504 of the Rehabilitation Act of 1973 .............................passim

**OTHER AUTHORITIES**

28 C.F.R. Parts 35 ...............................................................................12

28 C.F.R. Pt. 36, App. ..........................................................................13

28 C.F.R. § 35.104 .....................................................................11, 12, 13

28 C.F.R. §35.105 ................................................................................12

28 C.F.R. § 35.130(b)(7) .................................................................11, 14

28 C.F.R. § 35.136 ...............................................................................12

28 C.F.R. § 35.136(a) ..........................................................................12

28 C.F.R. § 36.104 (2010) ..............................................................13, 14

34 C.F.R. § 104.2 .................................................................................11

34 C.F.R. § 104.3(j)(2)(i) ....................................................................11

vi

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

C.C., a six-year-old child with severe autism, is being discriminated against by the Cypress School District.  The District refuses to allow C.C. to use his trained service dog while at school, and it refuses to modify its policies to accommodate such use.  In so doing, the District is violating federal and state disability laws and eroding the bond between C.C. and his service dog.  As the bond erodes, the service dog's efficacy—and C.C.'s condition—deteriorate.

The mandatory preliminary injunction sought is necessary to curtail the District's illegal discrimination and restore to C.C. his equal rights under the law.  The injunction will enhance the efficacy of C.C.'s service dog and help to improve C.C.'s condition.  Therefore, the Court should grant the Motion and order the injunction.

### II.   FACTUAL BACKGROUND

#### A.   C.C. Has Severe Autism

C.C. has been diagnosed with autism, a neurobiological condition which affects how he interacts with the world around him.  (*See* Declaration of Milka Ciriacks ("Ciriacks Dec.") ¶ 2.).  C.C.'s autism is severe: he is nonverbal, has a low cognitive level, and has severe difficulty interacting and communicating with others.  (*Id.* ¶ 3; Declaration of Dr. Thomas Lin ("Lin Dec.") ¶ 3.)  C.C. is currently six years old and a first grade student at Frank Vessels Elementary, within the Cypress School District.  (Ciriacks Dec. ¶ 26.)  C.C. uses a service dog to help address the symptoms associated with his autism.  (Ciriacks Dec. ¶¶ 10-25; Lin Dec. ¶¶ 7-11.)

Hallmark autistic behaviors include (1) self-stimulatory or self-regulating behavior, known as "stimming," and (2) running away or wandering off, often called "elopement."  (Declaration of Dr. Stephen M. Shore ("Shore Dec.") ¶ 17.)  An individual with autism will sometimes elope when he wants to escape an environment that has otherwise become overwhelming.  (*Id.* ¶ 17.)  Examples of stimming include: repeating the same phrase or sounds over and over, hand flapping, rocking back and

1

forth, and spinning in a circle.  (*Id.*)  The application of deep pressure can help a person with autism to cope with these symptoms by providing a sense of calm.  (*Id.* ¶ 34.)

C.C. exhibits the hallmark autistic behaviors discussed above.  (Ciriacks Dec. ¶¶ 3-8; Lin Dec. ¶¶ 3-4.)  C.C. is completely non-verbal and communicates mainly through the use of communication cards.  (Ciriacks Dec. ¶ 3; Declaration of Kati Rule-Witko ("Rule Dec.") ¶ 37.)  C.C. becomes anxious frequently, at least 4 times a day. (Ciriacks Dec. ¶ 4.)  When this happens, he will shriek, pace, plug his ears, laugh inappropriately, and flap his arms.  (*Id.*)  His behavior can escalate to the point that C.C.'s parents are unable to calm him down, and their only recourse is to physically remove him from the situation.  (*Id.*)  Two or three times a month, C.C. will become extremely agitated, to the point that he screams and drops to the ground or tries to run away.  (*Id.* ¶ 8.)  Recently, C.C. has started pinching and scratching people, and has begun to wet himself at school.  (*Id.* ¶¶ 38-39.)

On one occasion, C.C. ran away from home.  (*Id.* ¶ 12.)  C.C.'s mom had to call the police, who found him 45 minutes later, a quarter-mile away.  (*Id.*)  He had managed to cross one intersection and was about to cross another.  (*Id.*)  On another occasion C.C. slipped away from his aide at school and tried to board a school bus. (*Id.* ¶ 41.)  For individuals with autism, elopement is the primary cause of non-health-related deaths.  (Shore Dec. ¶ 33.)  Elopement is particularly dangerous for C.C. because he is nonverbal and cannot ask for help.  (Ciriacks Dec. ¶ 12.)

Much of C.C.'s behavior stems from his attempts to cope with the world around him.  (Shore Dec. ¶¶ 17, 23.)  For someone with autism, the world around him can be a scary and overwhelming place.  (*Id.* ¶¶ 16, 22.)  While there is no consensus why autism symptoms manifest in this manner, one theory is that individuals with autism have overactive nervous systems.  (*Id.* ¶ 16)  Whatever the reason, for someone with autism, sounds and physical sensations that would not draw the attention of the average person can be extremely overwhelming, causing them anxiety and frustration.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1 | (*Id.*)

2 | **B.     Eddy is a Certified Service Dog Trained to do Work and Perform
3 |         Tasks for the Benefit of C.C.**

4 |      In May 2010, C.C. was paired with his service dog, Eddy, which was trained by

5 | the Autism Service Dogs of America ("ASDA").  (Ciriacks Dec. ¶ 13.)  ASDA is a

6 | non-profit community-based organization in Lake Oswego, Oregon, which trains dogs

7 | to become service animals specifically for children with autism.  (Rule Dec. ¶ 7.)  In

8 | fact, ASDA trains and places service dogs only for children with autism, the majority

9 | of who are on the severe end of the autism spectrum.  (*Id.*)  To apply for and receive a

10 | service dog, C.C.'s family had to go through ASDA's extensive application process,

11 | which includes a comprehensive evaluation of the individual child, the child's

12 | disability, the family, and the family's goals for the service dog.  (*Id.* ¶¶ 8-9.)

13 |      **1.     Eddy Received Individualized Training to Meet C.C.'s Needs**

14 |      Eddy was extensively trained by ASDA.  (Rule Dec. ¶ 31.)  Each dog at ASDA

15 | goes through a training program which lasts nearly two years, starting when the dog is

16 | six to eight weeks old.  (*Id.* ¶ 12.)  Once a dog is matched with a particular child, it is

17 | trained to meet that child's unique needs. [1]  (*Id.* ¶ 32.)  This includes training the dogs

18 | to socialize and interact with a variety of people in different environments.  (*Id.* ¶ 12.)

19 | Because Eddy's trainer, Kati Rule-Witko, knew in advance that Eddy would be placed

20 | with C.C., Eddy's first year-and-a-half of training was spent almost exclusively in a

21 | classroom setting around children with autism who have meltdowns and outbursts on

22 | a daily basis.  (*Id.* ¶ 31.)  Eddy also received advance skills training, during which

23 | time he participated in 20-25 hours per week of intensive one-on-one training.  (*Id.* ¶

24 | 14.)  As a result, Eddy can obey approximately 30 different commands.  (*Id.* ¶ 15.)

25 | C.C.'s mother also traveled to Oregon for a two-week training on ASDA's methods.

26 | (*Id.* ¶ 34.)  Finally, Ms. Rule-Witko, Eddy's trainer, came to California to stay with

---

27 | [1] Before the ASDA places a dog, the dog must receive an exemplary score on the
28 | Assistance Dogs International public accessibility skills and socialization test. (Rule
    | Dec. ¶ 16.)

3

1    the family for three days of in-home training.  (*Id.*)

2    **2.   Eddy Works and Performs Tasks for the Benefit of C.C.**

3    Eddy's specialized training allows him to work and perform tasks for C.C. by

4    preventing or interrupting impulsive or destructive behaviors.  (Rule Dec. ¶ 37.)  This

5    includes preventing C.C. from eloping and intervening when C.C. is stimming.  (*Id.*)

6    Eddy also increases C.C.'s independence and improves C.C.'s communication and

7    social skills.  (*Id.*)

8    C.C.'s service dog is connected to him with a five-foot tether which loops

9    around C.C.'s waist and is connected to Eddy's service pack.  (*Id.*)  When C.C.'s

10    service dog is given the "Down Stay" command, the service dog lies down and

11    remains where he is – effectively thwarting any attempt by C.C. to run.  (*Id.*)  The

12    tether also serves the dual purpose of providing C.C. with greater independence:

13    without his service dog, C.C. must be constantly accompanied by an adult who must

14    physically hold C.C. by the arm or hand to prevent him from eloping.  (*Id.*)  With

15    Eddy, C.C. is free to walk safely within a five foot radius of his service dog without

16    adult control.  (*Id.*)

17    Eddy also intervenes and interrupts C.C.'s impulsive and destructive behaviors.

18    (*Id.*)  Eddy is trained to sense C.C.'s mood and intervene if C.C. begins feeling

19    anxious or starts stimming.  (*Id.*)  If C.C. engages in stimming behavior, Eddy is

20    trained to nudge or lick C.C. to calm him and redirect his attention.  (*Id.*)  Eddy is also

21    trained to apply deep pressure to help C.C. self-regulate and remain calm.  (*Id.*)  For

22    example, if C.C. is sitting down, Eddy will rest his head and legs in C.C.'s lap.  (*Id.*)

23    Eddy will also allow C.C. to drape his legs or body over Eddy's body, thereby

24    applying deep pressure.  (*Id.*)

25    Eddy improves C.C.'s communication and social skills, thereby increasing his

26    independence.  (Ciriacks Dec. ¶ 24; Rule Dec. ¶¶ 37-40.)  C.C. has also started to use

27    Eddy to communicate his needs.  (Ciriacks Dec. ¶ 20.)  When C.C. feels anxious, for

28    example, he will grab onto Eddy's leash signaling that he is ready to leave.  (*Id.*)  This

4

1   stands in stark contrast to C.C.'s prior behavior of having a tantrum or running away

2   and having to rely on adult assistance. (*Id.* ¶ 4.) Eddy also carries C.C.'s

3   communication cards in his service pack, which keeps them easily accessible to C.C.

4   (Rule Dec. ¶ 37.) Additionally, Eddy acts as an intermediary for C.C. by promoting

5   positive social interactions with children and adults that might not otherwise occur.

6   (*Id.*)

7       Notably, in the first few months Eddy and C.C. were together, C.C. learned to

8   call Eddy by name. (Ciriacks Dec. ¶ 21.) In fact, Eddy is the ***only*** name that C.C.

9   says. (*Id.*) He does not even say Mom or Dad. (*Id.*) In the months since C.C.

10   returned to school without Eddy, however, C.C.'s overall verbalization has decreased

11   and he says "Eddy" only on rare occasions. (*Id.*)

12
13   **C.   It is Necessary for C.C. to Use His Service Dog While at School to Maintain Their Bond**

14       For a service dog to be effective, the individual with autism and the service dog

15   must form and sustain a bond. (Rule Dec. ¶¶ 41-48.) Children with autism have a

16   more difficult time forming the necessary bond with their service dogs. (Declaration

17   of Dr. Cindy Adams ("Adams Dec.") ¶ 19.) The team bond allows Eddy to become

18   familiar with C.C.'s emotions and temperament so that he can detect when C.C. is

19   experiencing anxiety and spontaneously work to redirect his focus. (Rule Dec. ¶ 42.)

20   Likewise, C.C. must know that Eddy will always be with him in order to develop

21   routine and predictability. (*Id.* ¶ 43.) If that relationship is not created and

22   maintained, the service dog will not be able to perform the work it is trained to do.

23   (Rule Dec. ¶¶ 45-48; Adams Dec. ¶¶ 18-19.) Moreover, if a service dog does not

24   consistently spend time with the person being assisted, the dog will become confused

25   about its role as a working service animal and the necessary relationship between the

26   service dog and the person will not be formed or will deteriorate. (Adams Dec. ¶ 18.)

27       In C.C.'s case, experts agree that his service dog ***must*** accompany him at all

28   times, especially at school, so that this bond can be developed and maintained.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  (Adams Dec. ¶ 18; Rule Dec. ¶¶ 45-48.)  Since being separated from his service dog

2  during school hours, the bond between C.C. and Eddy has already begun to

3  deteriorate.  (Ciriacks Dec. ¶¶ 34-37.)  C.C. has become distant from Eddy, and

4  requires prompting to use Eddy to regulate his stimming; whereas, when C.C. and

5  Eddy were together all day, C.C. would look to Eddy to curb his stimming without

6  prompting.  (*Id.* ¶¶ 36-37.)

7  **D.     The District Refuses to Accommodate C.C.'s Request to use his
          Service Dog While at School**

8

9  Once C.C. was paired with his service dog in May 2010, C.C.'s mother

10 requested that the District accommodate C.C.'s use of his service dog while at school.

11 (Ciriacks Dec. ¶¶ 31-32.)  For the past eight months, and to date, the District has not

12 accommodated C.C.'s request to use his service dog while at school.[2]  (*Id.* ¶¶ 32-34.)

13 Nor did it modify its policies to permit C.C. to attend school with his service dog.

14 (*Id.*)  The District did not even permit Eddy's trainer to provide the in-school training

15 that she usually offers to school districts.  (Rule Dec. ¶ 35.)[3]  As a result, C.C.'s

16 parents, fearing that the benefits gained from having his service dog would be lost,

17 kept C.C. home during the last two weeks of the 2009-2010 school year and during

18 summer school.  (Ciriacks Dec. ¶ 32.)  Although these concerns remained, C.C.'s

19 parents decided that they had no option but to send C.C. to school for the 2010-2011

20 school year without Eddy.  (*Id.* ¶ 34.).

21 Accordingly, C.C. has since been attending school without his service dog,

22 and—at the District's insistence—has also been separated from his service dog during

23 his school-based home therapy sessions.  (Ciriacks Dec. ¶¶ 34-35.)  This amounts to a

24 continual separation from his service dog for roughly 40-hours each week, including

25 _____

[2] Mrs. Ciriacks was caught by surprise because the school's principal, Jane Snyder,
26 did not indicate that the school would object to the accommodation when Mrs.
   Ciriacks first inquired with the school about a service dog in March 2010. (Ciriacks
27 Dec. ¶ 28.)
   [3] Additionally, the District has instructed the therapists who provide C.C. with home
28 therapy not to interact with or use Eddy during C.C.'s home therapy. (Ciriacks Dec. ¶
   33.)  C.C. receives eight hours of home therapy per week. (*Id.*)

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  the roughly 6.5-hour length of each school day. (*Id.* ¶ 35.)

2  **III. PROCEDURAL HISTORY**

3      On August 27, 2010, C.C. filed a Complaint and Ex Parte Application for

4  Temporary Restraining Order to enjoin the District from refusing to allow C.C. to use

5  his service dog at school. The Court held that C.C. had not made the necessary

6  showing in his papers for issuance of a TRO (Hon. Stephen V. Wilson). But the Court

7  set an expedited preliminary injunction hearing so that the Court could hear additional

8  evidence from all parties in light of the urgency of the issue. The Court specifically

9  requested to hear live testimony at the hearing. The day before the preliminary

10  injunction hearing, however, the Court took the hearing off calendar and subsequently

11  dismissed the case without prejudice, finding that C.C. had failed to exhaust

12  administrative remedies.

13      C.C. then brought his claims in a due process complaint filed with the

14  California Office of Administrative Hearings ("OAH"). (Plaintiff's Request For

15  Judicial Notice In Support Of Motion for Preliminary Injunction ("RJN"), Ex. A.)[4]

16  The OAH dismissed the complaint on December 6, 2010, holding it did not have

17  subject matter jurisdiction over C.C.'s claims because C.C. did not allege any legal

18  issues that were within the limited jurisdiction of OAH.[5] (RJN, Ex. B.) C.C. has

19  thereby exhausted his administrative remedies, and has re-filed his Complaint for

20  adjudication by this Court.

21  **IV. ARGUMENT**

22      C.C. satisfies the legal standard for a mandatory preliminary injunction.

23      A preliminary injunction should issue where a plaintiff establishes the

24  following factors: (1) he is likely to succeed on the merits, (2) he is likely to suffer

25  ────────────

[4] Plaintiff's Request for Judicial Notice is being filed concurrently herewith.
[5] Defendants' actions in this matter can only be interpreted as dilatory. Given that
26  federal court was the appropriate forum to adjudicate the claims, Defendants should
have allowed the Court to rule on the merits of C.C.'s motion for preliminary
27  injunction in the first case. Instead, Defendants persuaded the Court to dismiss for
failure to exhaust administrative remedies, only to turn around and argue to the
28  administrative court that it had no jurisdiction to hear the claims, either.

7

1    irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in

2    his favor, and (4) an injunction is in the public interest. *Alliance for the Wild Rockies*

3    *v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (*citing Winter v. Natural Res. Def.*

4    *Council*, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)).  The court weighs these

5    factors along a "sliding scale" in which a stronger showing in one element may offset

6    a weaker showing in another. *Id.* "For example, a stronger showing of irreparable

7    harm to plaintiff might offset a lesser showing of likelihood of success on the merits."

8    *Id.* Likewise, if the balance of hardships tips sharply in favor of plaintiff, the Court

9    should grant the injunction if the plaintiff raises "serious questions going to the

10   merits" of the case. *Id.* at 1132. Serious questions are those which are "substantial,

11   difficult and doubtful" enough to require more considered investigation. *Rep. of the*

12   *Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

13          Plaintiff is entitled to a mandatory injunction if "the facts and law clearly favor

14   the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979).

15   Courts have granted mandatory injunctions where plaintiff is being denied rights

16   guaranteed under the Americans with Disabilities Act or Section 504 of the

17   Rehabilitation Act. *See, e.g.*, *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078,

18   1085 (N.D. Cal. 1997) (granting mandatory injunction forcing BART to bring its

19   elevators into compliance with the ADA); *D.R. v. Antelope Valley Union High School*

20   *Dist.*, 746 F. Supp. 2d 1132, 1149 (C.D. Cal. 2010) (granting mandatory injunction for

21   school to provide an elevator key to a student with a disability); *Franco-Gonzales v.*

22   *Holder*, --- F. Supp. 2d ----, 2010 WL 5874537, at *22 (C.D. Cal. Dec. 27, 2010)

23   (granting mandatory injunction ordering the government to provide counsel to aliens

24   with severe mental illnesses who were being detained pending removal proceedings).

25   The Court is "empowered to grant a mandatory injunction when prohibitory orders are

26   otherwise ineffective or inadequate." *Franco-Gonzales*, --- F. Supp. 2d ----, 2010 WL

27   5874537, at *22.

28          Here, as described below, (i) C.C. is more than likely to succeed on the merits;

8

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   (ii) C.C. is suffering irreparable injury; (iii) the balance of equities favors C.C.; and

2   (iv) the public interest is served by the issuance of an injunction to stop the District's

3   disability discrimination here.  Therefore, the Court should grant a mandatory

4   injunction requiring the District to accommodate C.C.'s use of his service dog at

5   school.

6        **A.**     **C.C. is Likely to Succeed on the Merits of his Claims Under Federal**
        **Law**

7

8        The ADA and Section 504 prohibit many types of discrimination. Specifically,

9   Title II of the ADA provides that "no qualified individual with a disability shall, by

10  reason of such disability, be excluded from participation in or be denied the benefits

11  of the services, programs, or activities of a public entity, or be subjected to

12  discrimination by any such entity." 42 U.S.C. § 12132. [6] To establish a violation of

13  Title II of the ADA, a plaintiff must show: (1) he is a "qualified individual with a

14  disability"; (2) he was either excluded from participation in or denied the benefits of a

15  public entity's services, programs or activities, or was otherwise discriminated against

16  by the public entity; and (3) such exclusion, denial of benefits, or discrimination was

17  by reason of his disability. *Rodde v. Bonta*, 357 F.3d 988, 995(9th Cir. 2004);

18  *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir.

19  1997); *see also Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).  To establish

20  a violation of Section 504, the plaintiff must show a violation of the ADA and that the

21  public entity receives federal funding. *Armstrong v. Davis*, 275 F.3d 849, 862 n.17

22  (9th Cir. 2001); *see also Henrietta D. v. Giulianni*, 331 F.3d 261, 272 (2d Cir. 2003). [7]

23       As to the second element, failure to provide a reasonable accommodation is

24

25  [6] Similarly, Section 504 provides that "[n]o otherwise qualified individual with a
    disability…shall by reason of …his disability, be excluded from the participation in,
26  be denied the benefits of, or be subjected to discrimination under any program or
    activity receiving Federal financial assistance." 29 U.S.C. § 794(a).
27  [7] Courts generally analyze claims under Title II of the ADA together with claims
    under Section 504. *See, e.g., Zukle v. Regents of Univ. of Cal.* 166 F.3d 1041, 1045
28  n.11 (9th Cir. 1999). Accordingly plaintiff has briefed the District's liability as to
    these claims together.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   actionable discrimination "because the ADA not only protects against disparate

2   treatment, it also creates an affirmative duty in some circumstances to provide special,

3   preferred treatment …." *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F.Supp. 962, 965

4   (N.D. Cal. 1998). *See also McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir.

5   2004) (ADA); *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (Section 504).

6   Indeed, "[t]he purpose of the ADA's reasonable accommodation requirement is to

7   guard against the facade of 'equal treatment' when particular accommodations are

8   necessary to level the playing field." *McGary v. City of Portland*, 386 F.3d 1259,

9   1267 (9th Cir. 2004). *See also Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F.

10   Supp. 2d 1134, 1136 (N.D. Cal. 1998) ("[i]n the context of disability, therefore, equal

11   treatment may not beget equality"). Stated differently, discrimination can occur if a

12   public entity fails to make reasonable modifications to its policies when a failure to do

13   so would result in discrimination on the basis of disability, unless the public entity can

14   show that making the modifications would fundamentally alter the nature of the

15   service, program, or activity. *See* 28 C.F.R. § 35.130(b)(7); *Sullivan v. Vallejo City

16   Unified Sch. Dist.*, 731 F. Supp. 947, 959 (E.D. Cal. 1990) (*citing Se. Cmty. Coll. V.

17   Davis*, 442 U.S. 397, 412, 99 S. Ct. 2361, 60 L. Ed. 2d 980 (1979)).[8]

18       It is well established that these laws apply to the parties here. It cannot be

19   disputed that C.C.—whose severe autism limits a number of major life activities,

20   including his ability to care for himself, speak, walk, read, communicate, and learn—

21   qualifies as an individual with a disability under Title II of the ADA and Section 504.

22   42 U.S.C. § 12102; 28 C.F.R. § 35.104; 34 C.F.R. § 104.3(j)(2)(i). It also cannot be

23   disputed that Cypress School District is a public school district supported by federal

24   and state funds, subjecting it to provisions of both Title II of the ADA and Section

25   504. 42 U.S.C. § 12131(1)(A); 28 C.F.R. § 35.104; 34 C.F.R. § 104.2. The facts

26

27   _____

[8] Although Title II of the ADA uses the term "reasonable modification," rather than "reasonable accommodation," these terms create identical standards. *See Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999). These terms are thus used interchangeably.

28

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1 unequivocally demonstrate that C.C. meets the remainder of the elements of these

2 claims.

### 1. The District is Discriminating Against C.C. by Failing to Accommodate C.C.'s Use of his Service Dog

5      C.C.'s choice to use his service dog in school is one that is reasonable and can

6 be accommodated without any burden or fundamental alteration of the school

7 program. Indeed, the Department of Justice's comments and regulations

8 implementing the ADA make clear that C.C.'s request to attend school with his

9 service dog is reasonable. *See Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d

10 1052, 1060 (5th Cir. 1997) (The regulations implementing the ADA provide

11 instructive guidance as to what constitutes a reasonable accommodation). [9] Absent

12 specific circumstances, which do not apply here,[10] the ADA regulations specifically

13 require the District to modify its policies to permit C.C. to use his service dog while at

14 school: "Generally, a public entity shall modify its policies, practices, or procedures

15 to permit the use of a service animal by an individual with a disability." 28 C.F.R. §

16 35.136(a) (rev).[11] A "service animal," as defined in the regulations implementing

17 Title II of the ADA, is "any dog that is individually trained to do work or perform

18 tasks for the benefit of an individual with a disability, including physical, sensory,

19 psychiatric, intellectual, or mental disability." 28 C.F.R. § 35.104 (rev).[12]

---

21 [9] Further, since Congress explicitly delegated authority to construe the statute by regulation, the Court should give the regulations controlling weight unless they are

22 arbitrary, capricious, or plainly contrary to statute. 42 U.S.C. §12134.; *See also Lovell v. Chandler*, 303 F.3d 1039, 1058-59 (9th Cir. 2002); *Bay Area Addiction Research &*

23 *Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 737 n.11 (9th Cir. 1999); *Dare v. California*, 191 F.3d 1167, 1172 (9th Cir. 1999). The Justice Department's

24 commentary concerning service animals, which is consistent with the plain language of the regulations, is also entitled to deference. *See Id.*

25 [10] A public entity may ask an individual with a disability to remove a service animal from the premises if "(1) The animal is out of control and the animal's handler does

26 not take effective action to control it; or (2) The animal is not housebroken." 28 C.F.R. § 35.136. Neither of these applies here. *See* Section IV.B.2 *infra*.

27 [11] The revised regulations took effect March 15, 2011.
[12] The Department of Justice recently published a correction to the original regulation

28 to clarify that the service animal's work or task must be related to the individual with disability not the handler's disability. Nondiscrimination on the Basis of Disability in

The Department of Justice has recognized that the use of service dogs has evolved: "Traditionally, service dogs worked as guides for individuals who were blind or had low vision. Since the original regulation was promulgated, service animals have been trained to assist individuals with many different types of disabilities." *See* 28 C.F.R. § 36.104 (2010); 28 C.F.R. Pt. 36, App. A (2010) ("Service Animal"). In its commentary, the Department of Justice acknowledged that, in some cases, "'critical forms of assistance can't be construed as physical tasks,' noting that the manifestations of 'brain-based disabilities,' such as psychiatric disorders and *autism*, are as varied as their physical counterparts." *Id.* (emphasis added). The regulations further clarify that work or tasks include, but are not limited to "helping persons with psychiatric and neurological disabilities *by preventing or interrupting impulsive or destructive behaviors*." 28 C.F.R. § 35.104 (2010) (Definitions) (emphasis added).[13]

In fact, the Department of Justice recently intervened on behalf of a family facing a very similar situation as that of C.C. in Portland, Oregon. (RJN, Ex. C.) In that case, after meeting with Justice Department officials, the school district changed its course and offered to allow the 10-year-old student with autism to bring his service dog to school on a trial basis. *Id.*

Here, Eddy qualifies as a service animal under the ADA regulations because he was individually trained to work and perform identifiable tasks for the benefit of C.C., an individual with a disability. From the time Eddy was four months old he has been trained as an autism service dog. (Rule Dec. ¶ 13.) The first year-and-a-half of Eddy's life was spent almost exclusively in a classroom setting around children with autism. (*Id.* ¶¶ 14, 31.) Further, Eddy learned how to obey 30 commands and

---

State and Local Government Services; Corrections, 76 Fed. Reg. 13285-01 (March 11, 2011).
[13] *See also, e.g., Storms v. Fred Meyer Stores*, 120 P.3d 126 (Wash. App. 2005) (holding that the plaintiff, a woman with post-traumatic stress disorder and recurrent depression, had made a prima facie case of disability discrimination by showing that her service dog was trained to put itself between the plaintiff and others to keep an open area around plaintiff and alleviate her anxiety).

12

received an exemplary score on the Assistance Dogs International public accessibility skills and socialization test. (*Id.* ¶¶ 15-16.) Finally, in light of C.C.'s particular needs, the last two months of Eddy's training (before he was placed with C.C.) consisted of teaching Eddy how to resist when C.C. tries to elope and how to prevent C.C. from engaging in self-stimulatory behavior. (*Id.* ¶ 33.)

Eddy also helps C.C. by "preventing or interrupting impulsive or destructive behaviors" in his daily life. 28 C.F.R. § 36.104 (rev.). For example, Eddy is trained to resist if C.C. tries to elope. (Rule Dec. ¶ 37.) Eddy is connected to C.C. through the use of a tether that loops around C.C.'s waist. (*Id.*) If C.C. tries to elope, Eddy goes into a "Down Stay" position which prevents C.C. from wandering off. (*Id.*) Additionally, Eddy is trained to apply deep pressure to C.C. to reduce C.C.'s stimming and other destructive behaviors that are characteristic of his autism. (*Id.*) This deep pressure relieves the sensory discomfort which causes C.C.'s destructive behaviors. (Shore Dec. ¶ 34.) Once C.C. and Eddy have been working together long enough, Eddy will be able to sense when C.C. is becoming frustrated or anxious, and respond without being prompted. (Rule Dec. ¶ 42.).

In sum, C.C.'s request to use his service dog in school is one that is reasonable and, as such, the District is required to accommodate it.

### 2. Permitting C.C. to Use his Service Dog in School Would Not Fundamentally Alter the District's Programs

The District will likely argue that accommodating C.C.'s choice to use his service dog would create a fundamental alteration to its programs. The District, however, cannot meet its burden of proving that modifying its policies to permit C.C. to use his service dog would fundamentally alter the nature of its service, program, or activity. 28 C.F.R. § 35.130(b)(7).[14]

---

[14] *Accord Sisson v. Helms,* 751 F.2d 991, 993 (9th Cir.), *cert. denied,* 474 U.S. 846, 106 S. Ct. 137, 88 L. Ed. 2d 113 (1985); *Sullivan,* 731 F. Supp. at 951 ("once plaintiff has made threshold showing that her decision to use the service dog is reasonably related to her disability, the sole issue to be decided under Section 504 is whether defendants are capable of accommodating her choice to use a service dog").

13

1    The changes the District will need to make to its program to accommodate

2  C.C.'s use of a service dog are minimal and would not create a fundamental alteration

3  of its program.  To accommodate C.C.'s request, a staff member would need to do

4  only two things – hold the dog's leash when it is outside the classroom and learn a few

5  commands. (Rule Dec. ¶¶ 49, 51.)

6    In light of Eddy's training, a staff member would not even need to feed or give

7  water to him or take him outside to relieve himself during the school day.  (*Id.* ¶¶ 49-

8  51.)  Notably, Eddy's trainer, who has placed approximately 24 service dogs with

9  families all over the country, reports that none of the schools in which she has placed

10  a service dog have had to hire additional staff to handle the dog.  (*Id.* ¶¶ 22, 28.)

11    Moreover, the presence of a service dog like Eddy will enhance the District's

12  programming by providing additional support in services like speech and occupational

13  and/or physical therapy.  (Shore Decl. ¶¶ 30-32; Rule Dec. ¶ 27.)  Stated differently,

14  autism service dogs lessen the work required of school staff because the service dog is

15  able to more quickly and effectively diminish or eliminate self-regulatory issues.  (*Id.*;

16  Rule Dec. ¶ 53.)  For example, the task of helping C.C. walk from one area to another

17  becomes far easier with the presence of the service dog because, without Eddy, C.C. is

18  prone to squirm and to wander off.  (Rule Dec. ¶ 53; Ciriacks Dec. ¶ 16.)  Eddy keeps

19  C.C. calm and prevents him from eloping or pacing around.  (Rule Dec. ¶ 37; Lin Dec.

20  ¶¶ 7-9; Ciriacks Dec. ¶ 16.)

21    Further, because the District has refused to allow C.C. to use his service dog

22  even for a trial period (Rule Dec. ¶ 35), the District does not have any evidence to

23  contradict C.C.'s ample evidence that allowing the service dog would not

24  fundamentally alter the nature of its services, programs, or activities.  Any effort to

25  prove otherwise is mere conjecture and is insufficient to meet its burden here because

26  "mere speculation that a suggested accommodation is not feasible" is inadequate; in

27  order to show that a proposed modification is unreasonable, a public entity must

28  "gather sufficient information from the disabled individual and qualified experts as

14

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   needed." *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010) (*quoting Duvall*

2   *v. County of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001)) (internal quotation marks

3   omitted). Accordingly, the District cannot meet its burden of proving that

4   accommodating C.C.'s service dog would "fundamentally alter" the nature of its

5   program.[15]

6        Therefore, the District is discriminating against C.C. by refusing to allow C.C.

7   to use his service dog at school. As a result, the service dog's efficacy, at school and

8   in other settings, is being reduced.

9        **B.    C.C. Is Likely to Succeed on His Claims Under California Law**

10        By failing to permit C.C.'s use of his service dog, the District is also violating

11   the California Disabled Persons Act (the "DPA"), the Unruh Civil Rights Act (the

12   "Unruh Act"), and California Government Code Section 11135.

13        **1.    <u>The District is Violating the Disabled Persons Act by Failing to
          Accommodate C.C.'s Use of his Service Dog</u>**

14

15        The District is liable for violating the California Disabled Persons Act ("DPA"),

16   which guarantees persons with disabilities "full and equal access" to places of public

17   accommodation. Cal. Civ. Code §§ 54.1 *et seq.* The DPA explicitly states, and courts

18   have recognized, that a violation of the rights of an individual under the ADA is a *per*

19   *se* violation of the DPA. *See* Cal. Civ. Code § 54.1(d); *see also Hubbard v. SoBreck*,

20   554 F.3d 742, 745 (9th Cir. 2009). Accordingly, this Court should find, without

21   further analysis, that the District has violated the ADA and as a result, has also

22   violated the DPA.

23        In addition, C.C. meets the standards under the DPA—independent of the

24   District's ADA violations—because the District actions directly violate the equal-

25   access mandate in Cal. Civ. Code § 54.1. That section provides that "[i]ndividuals

26   with disabilities *shall* be entitled to full and equal access." Cal. Civ. Code § 54.1

27

28   ─────────────────────
     [15] Moreover, the District must defer to C.C.'s choice to use his service dog to manage
     his disability as opposed to using some other method. *Sullivan*, 731 F. Supp. at 958.

(emphasis added). Public schools are among the broad range of facilities covered by Section 54.1(a)'s equal-access mandate. *Sullivan, supra,* 731 F. Supp. at 953-954. This equal-access mandate is implemented in part by Cal. Civ. Code § 54.2, which specifically establishes that "[e]very individual with a disability has the *right to be accompanied by a...service dog,* especially trained for the purpose, in any of the places specified in Section 54.1." Cal. Civ. Code § 54.2 (emphasis added); *Sullivan,* 731 F. Supp. at 959.

"In California, the scope of the duty of reasonable accommodation is, at the minimum, defined by the provisions of state law which require the defendant school district to grant access to plaintiff's service dog." *Sullivan,* 731 F. Supp. at 959. In *Sullivan,* the court found that a sixteen-year-old student with cerebral palsy was entitled to the use of a service dog while at school as a reasonable accommodation of her physical limitations associated with her disability. *Id.* at 947. In granting the student's request for a mandatory preliminary injunction, the court relied in part on the mandatory language found in Cal. Civ. Code. §54.2, which requires the school district to grant access to plaintiff's service dog. *Id.* at 958-59, 962. Notably, the *Sullivan* Court expressly rejected defendant's arguments that (1) the dog was unnecessary and (2) the dog created space and health concerns. *Id.* at 960. The *Sullivan* court also found that "[the District] may not claim that it cannot reasonably accommodate a disabled person's choice to use a service, guide or signal dog under section 504 on grounds that to do so would impose an undue administrative or financial burden on the institution." *Sullivan,* 731 F. Supp. at 959.

Here, as in *Sullivan,* C.C.'s requested use of his service dog is a reasonable accommodation of C.C.'s disability that the law requires the District to grant. Therefore, the Court should find that C.C. is likely to prevail on his DPA claim.

## 2. **The District is Violating the Unruh Act by Failing to Accommodate C.C.'s Use of his Service Dog**

The District is liable for violating the Unruh Act, which guarantees persons

16

with disabilities "full and equal access" in business establishments of every kind. Cal. Civ. Code §§51 *et seq.* Like the DPA, the Unruh Act explicitly states, and courts have recognized, that a violation of the rights of an individual under the ADA is a per se violation of the DPA. *See* Cal. Civ. Code § 51(f); *see also Hubbard v. SoBreck*, 554 F.3d 742, 745 (9th Cir. 2009). Accordingly, this Court should find, without further analysis, that the District has violated the ADA and as a result, has also violated the Unruh Act.

C.C. independently meets the standards under the Unruh Act because the District actions are directly violating the equal access mandate in Cal. Civ. Code § 51 *et seq.*, which provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). For purposes of the Unruh Act, public schools are business establishments. *Sullivan*, 731 F. Supp. at 952. For the same reasons above, the District's failure to allow C.C. access to school with his service animal denies C.C. "full and equal" access in violation of this Act.[16]

### 3. The District is Violating California Government Code Section 11135 by not Permitting C.C. to Use his Service Dog

The District is also violating Section 11135 of the California Government Code, which prohibits any program or activity that receives financial assistance from the state from denying "full and equal" access to persons with disabilities. Cal Gov't Code § 11135(a). Courts have offered little guidance in the interpretation of Section 11135. It is most commonly analyzed in the context of Section 504 because courts have held that "California Government Code § 11135 is identical to the Rehabilitation Act except that the entity must receive State financial assistance rather than Federal

---

[16] The court in *Sullivan* did not reach the merits of plaintiff's claims under the Unruh Act because it found that the plaintiff had demonstrated a clear probability of success on the merits. *Sullivan* at 957.

17

1   financial assistance." *D.K. ex rel. G.M. v. Solano County Office of Educ.*, 667

2   F.Supp.2d 1184, 1191 (E.D. Cal. 2009), *see also Williams v. Grannis*, 2010 WL

3   1405488 (E.D. Cal. 2010) (slip op.).  Therefore, if there is a violation of Section 504

4   and it the public entity receives state funding, there has been a violation of Section

5   11135.  Here the District receives state funding.  Further, as with the DPA, Section

6   11135 incorporates the protections and prohibitions of the ADA and its implementing

7   regulations.  A violation of the ADA or any of its implementing regulations is thus a

8   violation of Section 11135.  Therefore, the Court should find that C.C. is likely to

9   succeed on the merits of his claim that the District has violated Section 11135.

10      **C.      C.C. is Likely to Suffer Irreparable Harm Absent Preliminary**

11               **Relief**

12      C.C. is likely to suffer irreparable harm as the result of the District's refusal to

13   accommodate C.C.'s use of his service dog while at school.  The District's failure to

14   accommodate C.C.'s service dog is putting C.C.'s safety at risk and damaging the

15   bond between C.C. and his service dog, thereby reducing the efficacy of C.C.'s

16   service dog in his daily life.  Monetary damages are also inadequate to remedy these

17   injuries.

18      Although the current school year ends June 16, 2011, C.C. is enrolled in

19   summer school from July 5 to August 6, 2011.  C.C. will continue to suffer the

20   irreparable harm described below until he is permitted to use his service dog while at

21   school.

22      **1.      A Violation of C.C.'s Civil Rights Under the ADA Constitutes**

23               **Irreparable Harm**

24      Irreparable injury is presumed where, as here, defendants engage in acts or

25   practices prohibited by a statute that provides for injunctive relief.  The Ninth Circuit

26   has held that "where a defendant has violated a civil rights statute, we will presume

27   that the plaintiff has suffered irreparable injury from the fact of the defendant's

28   violation." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814,

18

827 (9th Cir. 2001); *United States v. Nutricology, Inc.*, 982 F.2d 394 (9th Cir. 1992) (holding that in statutory enforcement cases, where the government has met the "probability of success" requirement, it is presumed to have also met the "possibility of irreparable injury" requirement "because the passage of the statute is itself an implied finding by Congress that violations will harm the public"); *Smallwood v. Nat'l Can Co.*, 583 F.2d 419, 420 (9th Cir. 1978) (holding that irreparable harm could be presumed where there was a statutory violation of Title VII). The ADA is a civil rights statute that provides for injunctive relief to remedy acts of discrimination against persons with disabilities. *See* 42 U.S.C. § 12188 (a) (2). As explained *supra* in Section IV.B, there is a clear violation of the ADA in this case. As such, irreparable harm is presumed.

## 2. C.C. is Suffering Irreparable Harm

In addition to this presumed harm, C.C. is experiencing actual and irreparable harm on a daily basis. First, for a service dog to be effective, the individual with autism and the service dog must form a bond, which requires the service dog to accompany C.C. at all times. (Rule Dec. ¶¶ 41-48.) Accordingly, the District's refusal to accommodate C.C.'s use of his service dog in school is causing an irretrievable loss to their working bond, thereby reducing the efficacy of the service dog's training and value  in *every* aspect of C.C.'s life, and thus irreparably harming C.C.

In *Crowder v. Kitagawa,* the Ninth Circuit found that separating a service dog from its owner during the imposition of a 120-day quarantine on carnivorous animals in Hawaii "renders guide dog susceptible to *irretrievable* loss of training." 81 F.3d 1482 (9th Cir. 1996). (emphasis added).  Notably, the *Crowder* court stated: "It is no response to assert that the visually-impaired, like anyone else, can leave their dogs in quarantine and enjoy the public services they desire.  '[T]he general intent of Congress' was 'to ensure that individuals with disabilities are not separated from their service animals, such as guide dogs." *Id.* (*citing* 28 C.F.R. § 36, Appendix B, at 616 (service animals in public accommodations); 135 Cong. Rec. D956 (Statement of Sen.

1    Simon) ("As an auxiliary aid, the use of assistive animals is protected by the

2    Americans With Disabilities Act, in public accommodations as well as public services

3    (including schools).")).

4         Recognizing that irretrievable loss of training constitutes irreparable harm, the

5    Illinois Appellate Court in *Kalbfleisch v. Columbia Community Unit School District*

6    *Unit No. 4* upheld the lower court's finding that a five-year-old child with autism

7    would suffer irreparable injury if his service dog was not allowed to attend school

8    with him in order to maintain their bond.  396 Ill. App. 3d 1105, 1116-17 (2009).

9         Here, by keeping C.C. and his service dog apart for roughly 40-hours a week,

10   including the 6.5-hour length of each school day, the District is causing their bond to

11   deteriorate, thereby reducing the efficacy of the service dog's training and value to

12   C.C. in his daily life both in and out of the classroom.  (Adams Dec. ¶ 18; Rule Dec.

13   ¶¶ 45-48.)  It bears repeating that the team bond allows Eddy to become familiar with

14   C.C.'s emotions and temperament so that he can detect when C.C. is experiencing

15   anxiety and work to redirect his focus.  (Rule Dec. ¶ 42.)  Likewise, C.C. must know

16   that Eddy will always be with him in order to develop routine and predictability.  (Id.

17   ¶ 43.)  If that relationship is not created and maintained, the service dog will not be

18   able to perform the work it is trained to do.  (Rule Dec. ¶¶ 45-48; Adams Dec. ¶¶ 18-

19   19.)  Moreover, if a service dog does not consistently spend time with the person

20   being assisted, the dog will become confused about its role as a working service

21   animal and the necessary relationship between the service dog and the person will not

22   be formed.  (Adams Dec. ¶ 18.)  Therefore, not only is the District preventing C.C.

23   from accessing his service dog during school hours, it is preventing C.C. from

24   receiving the full benefit of service dog in his daily life.  As such, the District's refusal

25   to accommodate C.C.'s use of his service dog constitutes irreparable harm.

26        Second, C.C. is likely to suffer irreparable harm because the District's refusal to

27   accommodate Eddy is compromising his safety.  Children with autism are in constant

28   danger of eloping and thereby placing their lives at risk.  (Shore Dec. ¶ 17, 33.)  C.C.

20

1    has eloped before, walking a quarter-mile and crossing two intersections before police

2    were able to find him.  (Ciriacks Dec. ¶ 12.)  C.C.'s service dog has the ability to

3    prevent him from eloping.  (Rule Dec. ¶ 37.)  Therefore, the District's refusal to allow

4    C.C. to use his service dog at school is likely to cause irreparable harm by putting

5    C.C.'s safety at risk.

6         Finally, "injuries to individual dignity and deprivations of civil rights constitute

7    irreparable injury."  *Cupolo*, *supra*, 5 F. Supp. 2d at 1084 (*citing Chalk v. United*

8    *States Dist. Court*, 840 F.2d 701, 710 (9th Cir. 1988); *Sullivan*, *supra*, 731 F. Supp. at

9    961 (injury to ability to function as an independent person constitutes irreparable

10   injury)).  In *Bay Area Transit*, the court found that the unreliable elevator service in

11   the Bay Area Railroad Transit's ("BART") system caused individuals with disabilities

12   inconvenience and a loss of dignity and undermined the ADA's policy of assuring

13   equal opportunity, full participation, independent living, and economic self-

14   sufficiency to individuals with disabilities."  5 F. Supp. 2d at 1084.  As a result, the

15   court found that the class members were subjected and continued to be subjected to

16   irreparable injuries.  *Id.*

17        Here, much like the plaintiffs in *Bay Area Transit*, C.C. is being denied "equal

18   opportunity, full participation, independent living, and economic self-sufficiency" as

19   envisioned by the ADA.  5 F. Supp. 2d at 1084.  Each time C.C. experiences a

20   symptom of autism that his service dog would help alleviate, such as shrieking,

21   pacing, pinching, and pee accidents, the District is causing him harm for which he can

22   never be compensated.  Each time that C.C. must hold an adult's hand to move

23   outside the classroom to ensure his safety, the District is causing irreparable harm by

24   infringing upon his independence and dignity.

25        **3.    Money Damages Are Inadequate to Compensate C.C. for His**
          **Injuries**
26

27        Generally, an injury is considered irreparable when it is of such nature that the

28   injured party cannot be adequately compensated for such injury in damages.  *Zepeda*

21

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  *v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1984).  Damages would be completely

2  inadequate to compensate for injuries to C.C.'s safety, independence, dignity, and

3  bond with his service animal.

**D.      The Balance of Hardships Heavily Favors C.C.**

5       The balance of hardships tips strongly in C.C.'s favor.  C.C. has shown that he

6  is suffering and will continue to suffer grave and irreparable injury if a preliminary

7  injunction is not issued.  The District, on the other hand, will be required to make only

8  minor changes.  *See, e.g.*, *Sullivan*, 731 F. Supp. at 961 (district's inconvenience of

9  allowing service dog at school is insufficient compared to the injury suffered by

10  plaintiff to both her working relationship with her dog and her dignity and self-

11  respect); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983), *rev'd in part on other*

12  *grounds, Heckler v. Lopez*, 463 U.S. 1328, 104 S. Ct. 10, 77 L. Ed. 2d 1431 (1983)

13  ("[T]he physical and emotional suffering shown by plaintiffs in the record before us is

14  far more compelling than the possibility of some administrative inconvenience or

15  monetary loss to the government.  ...  Faced with such a conflict between financial

16  concerns and preventable human suffering, we have little difficulty concluding that

17  the balance of hardships tips decidedly in plaintiffs' favor.").

**E.      The Public Interest is Best Served by Issuing an Injunction Permitting C.C. the Use of His Service Dog While at School**

20       Permitting C.C. to attend school with his service dog is in the public interest

21  because discrimination against an individual on the basis of his or her disability under

22  the ADA, Section 504, and related state laws "is clearly contrary to public policy and

23  the interests of society as a whole."  *Anderson v. Little League Baseball, Inc.*, 794 F.

24  Supp. 342, 345 (D. Ariz. 1992) (granting temporary restraining order in favor of coach

25  who uses a wheelchair to allow him to serve as an on-field base coach during Little

26  League softball tournament).  The public has an interest in protecting the rights of

27  individuals with disabilities that require the use of service animals, including that

28  "deference must be shown to the manner in which a [person with a disability] chooses

22

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  to overcome the limitations created by [his] disabling condition." *Sullivan*, 731 F.

2  Supp. at 958.  Thus, the significant public interest at stake here favors issuing a

3  preliminary injunction.

4  **V.    PLAINTIFF SHOULD NOT BE REQUIRED TO POST A BOND**

5       The Court has the discretion to issue a preliminary injunction without requiring

6  plaintiff to post a bond.  *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir.

7  1999); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir.

8  2004).  "The court has discretion to dispense with the security requirement, or to

9  request mere nominal security, where requiring security would effectively deny access

10 to judicial review.  Moreover, special precautions to ensure access to the courts must

11 be taken where Congress has provided for private enforcement of a statute." *People*

12 *of State of Cal. v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26, amended

13 775 F.2d 998, (9th Cir. 1985) (affirming district court decision that plaintiff need not

14 post a bond after plaintiff indicated it was unable to post a substantial bond); *see also*

15 *Brantley v. Maxwell-Jolley*, 656 F. Supp. 2d 1161, 1178 (N.D. Cal. 2009) (plaintiffs

16 not required to post bond when seeking preliminary injunction under ADA where

17 requiring security would prevent plaintiffs' access to the court).  Here, requiring a

18 bond would effectively deny C.C. access to judicial review by this Court.  Therefore,

19 C.C. should not be required to post a bond.

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## VI.  CONCLUSION

In short, all of the factors weigh in favor of granting the Motion.  C.C. has demonstrated a high probability of success on the merits of his claims, that irreparable injury is occurring, that the balance of hardships weighs in C.C.'s favor, and that the public interest is served by curtailing the District's discrimination on the basis of disability.

For the foregoing reasons, the Court should issue a mandatory preliminary injunction requiring the District to accommodate C.C.'s use of his service dog in school.

DATED:  May 5, 2011                    Respectfully submitted,

                                       DISABILITY RIGHTS LEGAL CENTER
                                       WINSTON & STRAWN LLP


                                       By:   /s/ John S. Gibson

                                             John S. Gibson
                                             Attorneys for the Plaintiff

LA:290734.17        PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION